IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JOHN P. GALLAGHER,<br><br>Plaintiff,<br><br>v.<br><br>HAWAII SYMPHONY ORCHESTRA; AND DOES 1–20,<br><br>Defendants. | CIV. NO. 23-00395 JMS-RT<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS COMPLAINT, ECF NO. 11 |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS COMPLAINT, ECF NO. 11**

## I. INTRODUCTION

Defendant Hawaii Symphony Orchestra ("Defendant" or "the HSO") moves to dismiss Plaintiff John P. Gallagher's ("Plaintiff" or "Gallagher") Complaint alleging religious discrimination in violation of federal and Hawaii law based on the HSO's placement of Gallagher on indefinite unpaid leave after he refused to vaccinate against the SARS-CoV-2 virus in 2021, and after requesting an exemption. *See* ECF No. 11.

The HSO originally based its Motion to Dismiss on both a lack of subject-matter jurisdiction and failure to state claims. As explained later, however, the HSO withdrew its lack of subject-matter jurisdiction argument after the court

requested supplemental briefing. The court thus focuses on whether Gallagher's Complaint states plausible claims for relief. Based on the following, the Motion to Dismiss is GRANTED in part and DENIED in part.

## II. BACKGROUND

### A. Factual Background

The court assumes the following relevant allegations of the Complaint are true for purposes of this Motion to Dismiss. *See, e.g.*, *Steinle v. City & Cnty. of S.F.*, 919 F.3d 1154, 1158 n.1 (9th Cir. 2019).

#### *1. The 2021 COVID-19 Vaccine Mandate*

Gallagher "is a world-class bassist who for over twenty five years . . . has been a loyal, core member of HSO, having started his career in 1997." ECF No. 1 at PageID.4.[1] He is Catholic. *Id.* On August 11, 2021, Gallagher signed a contract witsh the HSO for the 2021 to 2022 season. *Id.* at PageID.5. He has been a member of the Musicians' Association of Hawaii, Local 677, American Federal of Musicians ("Local 677" or "the Union") since 1991. *Id.* at PageID.6 n.2. All musicians in the HSO are members of Local 677. *Id.*[2]

[1] In a symphony orchestra, a bass, or double bass, is a "stringed musical instrument, the lowest-pitched member of the violin family, sounding an octave lower than the cello." *Double Bass*, Britannica, https://www.britannica.com/art/double-bass [https://perma.cc/P9DR-MXJU].

[2] As discussed later, the court incorporates by reference the 2018–2020 Master Agreement between the HSO and Local 677, and related documents (collectively "the Collective Bargaining Agreement" or "the CBA"). *See* ECF Nos. 11-4, 11-7 and 11-8.

On or about October 22, 2021, the HSO "imposed a new term of employment on its musicians." *Id.* at PageID.5. The new term was a COVID-19 vaccine mandate, requiring "HSO musicians to be fully vaccinated for COVID-19, unless they have an approved exemption." *Id.* This "vaccine mandate" was negotiated between the HSO and Local 677 in light of the worldwide COVID-19 pandemic that began in 2020. The mandate was announced on October 22, 2021, and it became effective on October 25, 2021. *Id.* at PageID.6; ECF No. 11-4 at PageID.68; ECF No. 11-9 at PageID.200. The court refers to the HSO's vaccine mandate, which is essentially an addendum to the CBA, as the CBA's "COVID-19 Protocols" or "the Protocols."[3] In relevant part, the Protocols provided as follows:

> **Mandatory Vaccination:**
>
> All HSO musicians, staff, contractors, and volunteers are required to be fully vaccinated for COVID-19, unless they have an approved exemption. "Fully vaccinated" means at least two weeks have passed since receiving the second shot in a two-shot series or the single shot in a one-shot series of a vaccine for COVID-19, which has been authorized by the U.S. Food and Drug Administration (FDA).
>
> The HSO is providing a grace period to allow individuals time to be fully vaccinated. By December 10, 2021, all individuals must provide either proof of full vaccination or an approved exemption request. Employees in need of an exemption from this policy due to a medical reason, or because of a sincerely held religious belief, must submit

[3] Also as discussed later, the court incorporates the Protocols into the Complaint by reference. *See* ECF Nos. 11-4 and 11-9.

a completed Request for Exemption Form to the Personnel Manager (PM) by October 29, 2021.

. . . .

After December 10, 2021, any individual who has chosen not to be fully vaccinated or has not been approved for an exemption will be placed on leave without pay status but will retain their medical and instrument insurance through July 3, 2022. They may be permitted to return to work once these protocols are lifted, or they are in compliance with the protocols on a rolling basis; January 10, 2022, February 22, 2022, or May 16, 2022.

. . . .

**Exemptions:**

Individuals who have received an exemption or who have not yet received a response from a timely application must provide a negative PCR COVID-19 test date stamped no longer than 48 hours before each entry at the HSO Office, Hawaii Theatre Center, Blaisdell Concert Hall, or all other venues the HSO is utilizing in an official capacity. See the testing provision below. If an individual with an exemption who can play their instrument while wearing a face mask, refuses to be tested, they will be placed on leave without pay status but will retain their medical and instrument insurance through July 3, 2022. They may be permitted to return to work once these protocols are lifted, or they are in compliance with the protocols on a rolling basis; January 10, 2022, February 22, 2022, or May 16, 2022.

Individuals with an exemption that must remove their face mask in order to perform will not be able to utilize two levels of mitigation. This is considered a direct threat to the health and safety of the individual and others. Therefore, they will be placed on leave without pay status, but will retain their medical and instrument insurance through July 3, 2022. They may be permitted to return to work once these protocols are lifted, or they are in compliance with the protocols on a rolling basis; January 10, 2022, February 22, 2022, or May 16, 2022.

> **Face Masks:**
>
> Currently, per federal regulations and recent orders from the State of Hawaii, all individuals are required to wear a face mask while indoors, regardless of their vaccination status. The HSO recognizes exceptions to this masking requirement for individuals in performative situations or while on camera being filmed. Examples for HSO are for wind and brass players or for singers and speakers when actively performing. For those performing artists who are eligible for this exception, COVID testing will be required. Information regarding COVID testing will be sent out in the week prior to affected services.
>
> Face masks should be well-fitting, not transparent, have two or more layers, completely cover your mouth and nose, and fit snugly against the sides of your face with no gaps. Face masks with vents are not approved. Black medical masks will be available to anyone who requests them for performance services. If someone forgets their mask or needs a compliant mask for other rehearsals, they should let management know.

ECF No. 11-9 at PageID.200–01.

Under the face mask provisions, all musicians were required to wear face masks even if they were fully vaccinated. But even fully vaccinated musicians "in performative situations" such as "wind and brass players or . . . singers and speakers when actively performing"—because they could not wear a mask in those situations—would also be required to comply with testing protocols. *See id.* at PageID.201.

And under the exemption provisions, even if a musician received an exemption (or had applied for an exemption but was awaiting an answer), that

musician—if they could perform with a face mask—would *also* be required to test for COVID-19 periodically and receive a negative test result before being allowed to enter HSO venues. *See id.* at PageID.200–01. Moreover, even if a musician had received an exemption but "must remove their face mask in order to perform," that musician would "not be able to utilize two levels of mitigation," i.e., masking and testing. Such musicians (such as "wind and brass players or . . . singers and speakers when actively performing" would could not perform with a face mask) would be "considered a direct threat to the health and safety of the individual and others," and would thus be placed on indefinite leave without pay so long as they were not fully vaccinated (and *regardless* of receiving the exemption). *See* ECF No. 11-9 at PageID.200–01. Effectively, then, musicians who could not perform with a face mask had no real option under the Protocols—get vaccinated or be placed on leave without pay.

When the CBA's COVID-19 Protocols were negotiated, the Mayor of the City and County of Honolulu had declared a state of emergency pursuant to Hawaii law, and enacted a Proclamation and Emergency Order No. 2021-14 (and subsequent extensions) (the "Mayor's Proclamation"), of which the court takes judicial notice, as explained later. *See* ECF No. 11-6. Included within the Mayor's Proclamation was "Order 10, Safe Access Oahu," which provided as follows:

> A. All covered entities shall not permit a patron to enter covered premises without displaying proof of

> full vaccination, and identification bearing the same identifying information as the proof of full vaccination. Furthermore, all covered entities shall not permit a full or part-time employee, intern, volunteer, or contractor to enter covered premises without proof of full vaccination.
>
> B. Exceptions: The following individuals are exempt from this Order 10, section A above, and therefore may enter covered premises without proof of full vaccination, unless otherwise indicated in this Proclamation and Order:
>
> 1. Patrons with proof of a negative COVID-19 test result taken within 48 hours of entry into the covered premises, and identification bearing the same identifying information as the proof of negative COVID-19 test presented (the negative test result required under this section B must be from an FDA approved, or FDA EUA approved, molecular or antigen test);
>
> 2. Full or part-time employees, interns, volunteers, or contractors with proof of a negative COVID-19 test result taken within seven (7) days of entry into the covered premises (the negative test result required under this section B must be from an FDA approved, or FDA EUA approved, molecular or antigen test);
>
> 3. Individuals under 12 years of age; or
>
> 4. Individuals entering and remaining for 15 minutes or less per 24-hour day . . . .

ECF No. 11-6 at PageID.109–10. The Mayor's Proclamation did not include specific religious or disability exceptions. And Order 12 of the Proclamation

provided for penalties for violation of any of the Proclamation's orders, to be enforced by law enforcement personnel of the State of Hawaii and City & County of Honolulu. *Id.* at PageID.112–13.

### *2. The October 2021 Imposition of the CBA's COVID-19 Protocols and Gallagher's Request for an Exemption*

The Complaint describes certain events that happened during a Zoom call on October 22, 2021 ("the Call"), conducted and led by Union attorney Barbara Jaccoma. ECF No. 1 at PageID.6.[4] During the Call, the HSO's musicians were told the details of the CBA's COVID-19 Protocols and were asked to vote on them. *Id.* The Complaint alleges that during the Call, "Mr. Gallagher (and other Catholics on [t]he Call) was publicly derided as a person of faith and mocked because he is Catholic." *Id.* It also describes allegedly discriminatory or offensive remarks made by Jaccoma regarding requests for religious accommodation from Catholics based on publicized statements from Pope Francis, the head of the Catholic Church; and other "belittl[ing]" remarks regarding unvaccinated individuals. *Id.* at PageID.7. Moreover, the Complaint includes several paragraphs describing purported shortcomings of the Protocols, stating that they were "irrational, arbitrary, and capricious from the start." *Id.* at PageID.9.

[4] The Complaint alleges that "[u]pon information and belief, Ms Jaccoma is an attorney licensed in New York State and is not licensed in Hawaii." ECF No. 1 at PageID.6 n.3.

Ultimately, however, the Complaint does not challenge the CBA's COVID-19 Protocols facially. Rather, the Complaint alleges causes of action (Counts I and II) under Title VII and Hawaii Revised Statutes ("HRS") Chapter 378 for disparate treatment based on religion and failure to accommodate. *Id.* at PageID.14–20. It also alleges, in Counts III and IV, unlawful retaliation under Title VII and HRS Chapter 378. And it alleges in Count V a stand-alone claim for punitive damages, describing allegations of willful and intentional discrimination. *Id.* at PageID.23–24.

The causes of action are based on allegations that Gallagher sought a timely religious-based exemption under the terms of the Protocols, but the HSO ignored the request and, instead, placed him on indefinite unpaid leave after he failed to submit proof of an approved COVID-19 vaccination. *Id.* at PageID.10–13. It alleges that "[f]ollowing his submission [of the exemption request], HSO did not ask Mr. Gallagher any follow up questions concerning his sincerely held religious beliefs, nor did it engage him in the interactive process for a reasonable accommodation, even while Mr. Gallagher followed up with HSO for status on his accommodation request." *Id.* at PageID.10. Instead, the

> HSO skipped the interactive process entirely and unilaterally declared without any specific basis that Mr. Gallagher was a "direct threat" to others, even though he was not; conclusively declared without any specific basis that no accommodation to the Policy was possible for Mr. Gallagher because it would create for HSO an

> "undue hardship;" and then placed him on indefinite unpaid leave.

*Id.* at PageID.10–11. That is, he alleges that "[his] request was not processed at all—it was completely ignored." *Id.* at PageID.12.

The Complaint contends that the HSO did not allow Gallagher to perform even with some of the testing provisions in the Protocols. It alleges that "the Policy expressly states that individuals, like Mr. Gallagher, 'who have not received a response' to their request for accommodation must in the alternative provide a negative PCR test no longer than 48 hours old, in order to enter a HSO office or venue," and "despite this express term, Mr. Gallagher was given no such choice." *Id.* at PageID.12. "Instead, HSO informed him that '[a]t this time, a religious exemption would result in necessary accommodations that would place an undue hardship upon the organization and pose a direct threat to health and safety.'" *Id.* And it alleges that he was otherwise not given "the option to mask and/or to use 'a negative PCR COVID-19 test date stamped no longer than 48 hours before each entry at the HSO Office.'" *Id.* at PageID.13.[5]

---

[5] The Complaint also alleges "upon information and belief," that the HSO granted "at least one accommodation from the Policy, based on a sincerely held religious belief, to another HSO musician who, unlike Mr. Gallagher, was not placed on indefinite unpaid leave." ECF No. 1 at PageID.20.

### *3. Allegations of Retaliatory Conduct*

As for retaliation, the Complaint alleges that "[a]fter he requested an accommodation from the Policy, Mr. Gallagher did not hear from HSO on the status of his request for several weeks," and "[w]hen he followed up with HSO for a status . . . [it] responded by arbitrarily calling him [a] 'threat to others' and placed him on indefinite unpaid leave." *Id.* Specifically, it alleges that "[Gallagher] engaged in the protected activity of requesting an accommodation from the Policy based on his sincerely held religious beliefs and/or because he engaged in the protected activity of filing a Charge of discrimination with the [Equal Employment Opportunity Commission ("EEOC")] and [Hawaii Civil Rights Commission ("HCRC")] after his request was denied" and that "[h]e was placed on indefinite unpaid leave without any interactive process after submitting his request for accommodation, and after he followed up on that request[.]" *Id.* at PageID.21. And it alleges that "[t]here is a causal link between the two—submitting his protected request for accommodation and [the] HSO's adverse employment action[.]" *Id.*

## B. Procedural Background

Plaintiff timely filed this action on September 26, 2023, after he received right-to-sue letters from the EEOC and HCRC on June 29, 2023 and July 19, 2023 respectively. *See* ECF No. 1 at PageID.4. The HSO filed its Motion to

Dismiss on October 23, 2023. ECF No. 11.[6] Gallagher filed his Opposition on December 29, 2023, ECF No. 22, and the HSO filed a Reply on January 8, 2021, ECF No. 23. Supplemental briefs were filed on January 18, 2024. ECF Nos. 25, 26. The court heard oral argument on February 7, 2024. ECF No. 29.

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) permits a motion to dismiss for "failure to state a claim upon which relief can be granted." A Rule 12(b)(6) dismissal is proper when there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged." *UMG Recordings, Inc. v. Shelter Capital Partners, LLC*, 718 F.3d 1006, 1014 (9th Cir. 2013) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)). Rule 12 is read in conjunction with Rule 8(a)(2), which "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation and internal quotations omitted).

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a complaint must offer "more than labels and conclusions," and instead contain "enough factual matter" indicating "plausible" grounds for relief, not

[6] Gallagher asks the court to deny the Motion under Local Rule ("LR") 7.8 because the HSO, admittedly, did not meet and confer within seven days prior to filing the Motion as required by LR 7.8. Instead, the parties only met-and-conferred three days prior the filing of the Motion. In an exercise of discretion, the court declines to strike the motion based on LR 7.8. The HSO's counsel has adequately explained the reasons for the discrepancy, and further explains that a substantive discussion was held between counsel. *See* ECF No. 23-1.

merely "conceivable" ones. *Banks v. N. Tr. Corp.*, 929 F.3d 1046, 1055–56 (9th Cir. 2019) (citing *Twombly*, 550 U.S. at 555–56). And in a Rule 12(b)(6) analysis, the court accepts as true the material facts alleged in the complaint and construes them in the light most favorable to the nonmovant. *Steinle*, 919 F.3d at 1160.

## IV. DISCUSSION

### A. The Court Will Consider Information Regarding COVID-19, the Master Collective Bargaining Agreement, and Related Documents

Initially, Gallagher challenges the HSO's use in these proceedings of certain exhibits attached to its Motion to Dismiss and other information not specifically referred to in the Complaint. *See* ECF No. 22 at PageID.241–43. In particular, Gallagher objects to the use of certain data from the State of Hawaii Department of Health regarding COVID-19 infections and corresponding deaths as of October 18, 2023 ("COVID-19 data"). *See* ECF No. 11-2 at PageID.47. He also objects to the use of the Mayor's Proclamation. *See* ECF No. 11-6.

When evaluating a complaint's allegations under a Rule 12(b)(6) motion to dismiss, courts generally may not consider material outside the complaint. *See, e.g.*, Fed. R. Civ. P. 12(d). Two exceptions are (1) the incorporation-by-reference doctrine, and (2) judicial notice. *See, e.g.*, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

"[I]ncorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Id.* at

1002. It allows courts to incorporate documents into a complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.* (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)). Doing so "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* (citation omitted). "[T]he mere mention of the existence of a document is insufficient to incorporate the contents of a document." *Id.* (quoting *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010)). But if a claim "necessarily depend[s]" on a document, courts can incorporate it by reference. *Id.* It is "[a] more difficult question" whether a document can ever 'form[] the basis of the plaintiff's claim' if the complaint does not mention the document at all." *Id.* (quoting *Ritchie*, 342 F.3d at 907).[7]

---

[7] *Khoja* cautioned courts about what inferences it may draw from incorporated documents, "consistent with the prohibition against resolving factual disputes at the pleading stage." 899 F.3d at 1003 (citations omitted). It explained:

> Submitting documents not mentioned in the complaint to create a defense is nothing more than another way of disputing the factual allegations in the complaint . . . . Although the incorporation-by-reference doctrine is designed to prevent artful pleading by plaintiffs, the doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim.

*Id.* Thus, the doctrine does not allow a court to consider a defense (at the pleading stage) that is inconsistent with a well-pled complaint. *See id.* at 1002 ("[I]f the document merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint. Otherwise, defendants could use the doctrine to insert their own version of events into the complaint to defeat otherwise cognizable claims.").

Similarly, courts can consider matters outside the pleadings by judicial notice under Federal Rule of Evidence 201. Rule 201 "permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'" *Id.*, 899 F.3d at 999 (quoting Fed. R. Evid. 201(b)). "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Id.* (quoting Fed. R. Evid. 201(b)(1)–(2)). Although a court may take judicial notice of matters of public record, it "cannot take judicial notice of disputed facts contained in such public records." *Id.* And "[a] court must also consider—and identify—which fact or facts it is noticing from such a [record]. Just because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id.*

Given these principles, Gallagher asks the court to disregard (1) the COVID-19 data, *see* ECF No. 11-2 at PageID.47; and (2) the Mayor's Proclamation (and subsequent extensions) regarding the COVID health crisis, *see* ECF No. 11-6. Gallagher argues that his Complaint does not reference such information and their use at this stage violates the incorporation-by-reference doctrine and judicial-notice limitations.

The COVID-19 statistics cited in the HSO's Motion were taken from the State of Hawaii, Department of Health's online listing of COVID-19 case

counts. *See* ECF No. 11-2 at PageID.47 nn. 1, 2. This information is a matter of public record. Although the statistics are cited as true figures of infected individuals and deaths, the Motion to Dismiss does not base its arguments on those figures themselves. Rather, it cites the statistics in support of the HSO's introductory statement that "[t]he COVID-19 pandemic is a public health emergency in Hawai'i." *Id.* at PageID.47. Although the court cannot now (in March of 2024) easily confirm that those figures are the same as were posted on October 18, 2023, there is no argument that those figures are false. This lawsuit is not based on the precise accuracy of those figures; it is based on actions or inactions that occurred because of the COVID-19 crisis. Moreover, no one can reasonably question that the COVID-19 pandemic was declared as a public health emergency in 2020 to 2022, which is the time-frame largely at issue in the Complaint. The court thus takes judicial notice of the figures cited by the HSO as an indication that COVID-19 was a public health crisis at relevant times.

Similarly, the court takes judicial notice of the contents of the Mayor's Proclamation, including its specific emergency orders—both the October 8, 2021, version at ECF No. 11-6, PageID.103–148, and subsequent extensions of the Proclamation until March 6, 2022, *see* ECF No. 23 at PageID.268–69 (noting the extensions). These are public documents, the contents of which are undisputed. Although some might have questioned whether certain requirements or orders

within the Mayor's Proclamation were necessary, this suit is not challenging the necessity of any particular order. And there can be no dispute that the Mayor's Proclamation contained the requirements and orders. The court is not taking judicial notice of any disputed facts within the Mayor's Proclamation. Rather, it is taking judicial notice of undisputed adjudicative facts under Federal Rule of Evidence 201(b). *See, e.g.*, *Reclaim Idaho v. Little*, 469 F. Supp. 3d 988, 995 n.1 (D. Idaho 2020) (taking judicial notice at a preliminary injunction stage of COVID emergency proclamations and stay-at-home orders); *Clark v. Governor of N.J.*, 53 F.4th 769, 772 n.5 (3d Cir. 2022) (taking judicial notice of such COVID-19 government orders).[8]

### B. The HSO Has Withdrawn Its Argument That, Because Plaintiff Failed to Exhaust or Arbitrate the Present Dispute, the Court Lacks "Subject-Matter Jurisdiction"

Next, the HSO had argued that this court lacks "subject-matter jurisdiction" because Gallagher had not filed or exhausted union grievance

---

[8] The HSO's Motion to Dismiss also relies on (1) the Master Agreement between the HSO and Local 677, ECF No. 11-7; and (2) related Local 677 documents, including the CBA's COVID-19 Protocols. Gallagher, however, does not object to the HSO's citation to the Master Agreement or the COVID-19 Protocols.

In any event, the Master Agreement and the Protocols fall within the incorporation-by-reference doctrine. Some of the COVID Protocols (referred to in the Complaint as "the Policy") are cited in the Complaint and certainly form, at least in part, "the basis of the plaintiff's claim." *Khoja*, 899 F.3d at 1002. *See, e.g.*, ECF No. 1 at PageID.5 (Complaint describing various provisions of the COVID Policy, which the "HSO imposed [as] a new term of employment on its musicians"). Further, the court will allow the HSO to rely on provisions of the Master Agreement that are not subject to dispute because the Complaint also alleges or implies that the Policy was adopted as part of the CBA. The Complaint relies on related union matters and the alleged relationship between the Union and the HSO. *See, e.g.*, *id.* at PageID.6.

procedures set forth in the Master Agreement, which is the operative CBA to which Gallagher is or was a member. *See* ECF No. 11-2. at PageID.51–55.

Initially, the court emphasizes that the failure to comply with the CBA's grievance provisions—even assuming they applied here—would not have affected the court's "subject-matter jurisdiction." Rather, such a requirement is akin to a non-jurisdictional "claim-processing rule" that can be waived. *See, e.g.*, *Union Pac. R.R. Co. v. Brotherhood of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment*, 558 U.S. 67, 81–82 (2009) (discussing difference between jurisdictional and claim-processing rules); *Ruiz v. Donahoe*, 784 F.3d 247, 249 (5th Cir. 2015) ("[M]andatory grievance and arbitration procedures in contracts, such as the CBA . . . are waivable and do not affect this court's subject-matter jurisdiction."); *Wilkins v. United States*, 143 S. Ct. 870, 876 (2023) ("Loosely treating procedural requirements as jurisdictional risks undermining the very reason Congress enacted them.").

When first reviewing the issue, the court sought supplemental briefing from the parties as to whether the Master Agreement's mandatory grievance language was specific enough to encompass statutory claims such as the Title VII-based claims alleged in this case. *See* ECF No. 24; *see, also*, *e.g.*, *Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 79–82 (1998) (concluding that a union-negotiated waiver of an employee's statutory right to a judicial forum for statutory

discrimination claims must be clear and unmistakable). In its response, the HSO forthrightly conceded that the Master Agreement does not "clearly and unmistakably" indicate an intent to arbitrate statutory discrimination claims, and thus indicated that it withdraws this argument. *See* ECF No. 26 at PageID.298. Accordingly, the court proceeds to analyze whether the Complaint states a plausible claim for relief, and whether the HSO is entitled to an undue-hardship defense as a matter of law at this stage of the proceedings.

### C. The Complaint States a Plausible Claim Under Title VII and HRS Chapter 378

The HSO argues that the Complaint fails to state a claim under Title VII and HRS Chapter 378 (the corresponding state-law discrimination statute) for two reasons.

First, it argues the Complaint does not allege an "adverse employment action." *See, e.g.*, *Storey v. Burns Intern Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (analyzing an "adverse employment action" element in addressing a motion to dismiss a Title VII claim); *cf. Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 655 (9th Cir. 2006) (reiterating, for purposes of the *McDonnell Douglas* burden-shifting analysis at summary judgment, that a prima facie case of a failure-to-accommodate Title VII claim requires, among other things, a showing that an

employer "discharged, threatened, or otherwise subjected [plaintiff] to an adverse employment action").[9]

Second, it argues that it could not have granted Gallagher a religious exemption from the COVID-19 vaccination requirement because granting such an exemption would have constituted an "undue hardship" as a matter of law. The court addresses each argument in turn, but ultimately disagrees with both reasons at the motion-to-dismiss stage.[10]

---

[9] Although "an employment discrimination plaintiff need not plead a prima facie case of discrimination," *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002), to survive a motion to dismiss, a complaint must nevertheless "state a plausible claim for relief" that "permits the court to infer more than the mere possiblity of misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). And a plaintiff who fails to allege an "adverse employment action" is not a person "claiming to be aggrieved" under Title VII, which provides in pertinent part that "a civil action may be brought . . . by the person claiming to be aggrieved." *Storey*, 390 F.3d at 764 & n.12 (quoting 42 U.S.C. § 2000e-5(f)(1)).

[10] The court *does*, however, agree with the HSO that Gallagher's Opposition improperly relies on the now-retired "no set of facts" standard in opposing a motion to dismiss in federal court. *See, e.g.*, ECF No. 22 at PageID.252 (relying on the standard from *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957) that a claim may be dismissed only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). The "no set of facts" standard was abrogated by *Bell Atlantic v. Twombly*, 550 U.S. 544, 562–63 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *See, e.g.*, *Johnson v. City & Cnty. of Honolulu*, 2023 WL 1993972, at *3 (D. Haw. Feb. 14, 2023) ("The 'no set of facts' pleading standard does not reflect current law [in federal court] . . . ."). Although it remains true that a complaint requires only "a short and plain statement of the claim," it nevertheless must be "plausible on its face," *Twombly*, 550 U.S. at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. For the most part, Plaintiff meets the plausibility standard.

### *1. Adverse Employment Action*

The HSO argues that the Complaint, which alleges that Gallagher was placed on unpaid leave for failing to vaccinate, is insufficient as a matter of law because unpaid leave is not an adverse employment action. This argument applies to both Gallagher's discrimination and retaliation claims. *See, e.g.*, *Berry*, 447 F.3d at 655 (setting forth elements of a prima facie Title VII claim); *Poland v. Chertoff*, 494 F.3d 1174, 1179–80 (9th Cir. 2007) ("To establish a claim of retaliation, a plaintiff must prove that (1) the plaintiff engaged in a protected activity, (2) the plaintiff suffered an adverse employment action, and (3) there was a causal link between the plaintiff's protected activity and the adverse employment action.") (citation omitted).

But the Ninth Circuit "define[s] 'adverse employment action' broadly." *Fonseca v. Sysco Food Servs. of Ariz.*, 374 F.3d 840, 847 (9th Cir. 2004) (citations omitted). The Ninth Circuit accords with other Circuits that "take an expansive view of the type of actions that can be considered adverse employment actions." *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000) (citations omitted). Thus, it "ha[s] recognized that an adverse employment action exists where an employer's action negatively affects its employee's compensation." *Fonseca*, 374 F.3d at 847 (citation omitted). And imposing indefinite unpaid leave

in response to an employee's request for a religious accommodation—as alleged here—certainly "negatively affects [an] employee's compensation." *Id.*

There might be some situations where unpaid leave could itself constitute a reasonable accommodation. *See, e.g.*, *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986) ("We think that the school board policy in this case, requiring respondent to take unpaid leave for holy day observance that exceeded the amount allowed by the collective-bargaining agreement, would generally be a reasonable one."). But unpaid leave can nevertheless constitute an adverse employment action, especially here—as Gallagher alleges, *see, e.g.*, ECF No. 1 at PageID.13—the unpaid leave was both involuntary and indefinite. Indeed, in denying similar motions to dismiss failure-to-accommodate claims (including claims based on COVID-19 vaccination requirements), courts within the Ninth Circuit have reasoned that "[t]he fact that unpaid leave may, in certain circumstances and where requested, constitute a reasonable accommodation does not mean that it cannot also be an adverse action, particularly where the employee is placed on unpaid leave involuntarily." *Zimmerman v. PeaceHealth*, 2023 WL 7413650, at *5 (W.D. Wash. Nov. 9, 2023) (quoting *Steenmeyer v. Boeing Co.*, 92 F. Supp. 3d 1024, 1031 (W.D. Wash. 2015) (alteration omitted); *see also, e.g.*, *Cox v. Nw. Regional Educ. Serv. Dist.*, 2024 WL 777598, at *8 (D. Or. Feb. 23, 2024) ("*Ansonia* is not on point and it does not hold that placement on extended or

indefinite unpaid leave is not an adverse employment action as a matter of law."); *Magee v. Trader Joe's Co.*, 2020 WL 9550008, at *11 (D. Or. Sept. 1, 2020) ("[P]lacing an employee on unpaid leave involuntarily may be considered an adverse action."); *E.E.O.C. v. United Postal Serv. Inc.*, 2017 WL 3503676, at *5 (D. Ariz. June 19, 2017) (reasoning that forced unpaid leave in response to request for additional accommodations could constitute an adverse employment action); *Dawson v. Akal Sec. Inc.*, 660 F. App'x 504, 506 (9th Cir. 2016) ("The fact that unpaid leave may be a reasonable accommodation *when it is requested* 'does not mean that it cannot also be an adverse action, particularly where the employee is placed on unpaid leave involuntarily.'") (mem.) (quoting *Steenmeyer*, 92 F. Supp. 3d at 1031).

The court is persuaded by the reasoning of these cases and thus rejects Defendant's argument that, under the facts as pled, the Complaint fails to state a claim merely because it's based on imposition of unpaid leave.

***2. Undue Hardship***

Next the HSO argues that granting an exemption would have resulted in an undue hardship in its operations. As applicable here, under Title VII (and similarly under HRS Chapter 378)[11] it is an unlawful employment practice for a

[11] Under Hawaii state law, Hawaii Administrative Rules ("HAR") provide "undue hardship" as a defense to religious discrimination. *See* HAR § 12-46-157.

covered employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e-2(a)(1).[12] And Title VII defines "religion" as including:

> all aspects of religious observance and practice, as well as belief, *unless an employer demonstrates that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship* on the conduct of the employer's business.

42 U.S.C. § 2000e(j) (emphasis added); *see also* 29 C.F.R § 1605.2(e) (defining undue hardship).

An undue hardship defense would also preclude liability premised on a failure to engage in an "interactive process" in this Title VII context. Although a failure to engage in an interactive process is not an independent claim in a Title VII case, it may constitute evidence of discriminatory animus. *See Shahid-Ikhlas v. N.Y. & Presbyterian Hosp., Inc.*, 2023 WL 3628151, at *6 (S.D.N.Y. May 5, 2023) ("[T]o the extent that Plaintiff seeks to assert a [Title VII] claim based on Defendant's alleged failure to engage in an interactive process . . . the Court finds that there is no such independent claim."), *report and recommendation adopted*,

[12] HRS § 378-2(a)(1)(A) also makes it an unlawful discriminatory practice, among other reasons, for any employer "to discriminate against any individual *in compensation* or in the terms, conditions, or privileges of employment" (emphasis added) because of religion (among other protected classes).

2023 WL 3626435 (S.D.N.Y. May 24, 2023); *cf. Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) ("[T]here exists no stand-alone claim [under the ADA] for failing to engage in the interactive process. Rather, discrimination results from denying an available and reasonable accommodation."). But "[i]f an employer can show that no accommodation was possible without undue hardship, it makes no sense to require that he engage in a futile act." *E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 615 (9th Cir. 1988); *see also id.* at 615 n.7 ("[The Ninth Circuit has] often allowed an employer who has made no attempt at accommodation to argue as justification 'undue hardship.'") (citation omitted). "[A]n employer does not act in bad faith when it does not attempt an accommodation it sincerely believes would cause it undue hardship." *Id.* at 615 n.7.

*Groff v. DeJoy*, 143 S. Ct. 2279 (2023), recently clarified that to demonstrate "undue hardship" an employer "must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Id.* at 2295. *Groff*, addressing case law that adopted a "de minimis" standard, clarified that an undue hardship defense "means something very different from a burden that is merely more than de minimis. . . ." *Id.* (analyzing 29 C.F.R § 1605.2(e), which uses the term "more than de minimis cost" in addressing undue hardship). And the Supreme Court explained that

"courts must apply the test in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of an employer." *Id.* (citation and internal editorial marks omitted).

The HSO argues that it could not have granted Gallagher a religious exemption because doing so would have constituted an undue hardship as a matter of law, raising two basic types of undue hardship—a conflict with laws, and jeopardy to other employees and the public.

*a. Conflict with laws*

The HSO contends that if it had granted Gallagher an exemption as he requested then it would have unlawfully violated vaccination standards required by the Mayor's Proclamation. *See* ECF No. 11-6 at PageID.112 ("[V]iolation of any of the orders is an emergency period infraction . . . and subject to a $250 fine, unless the Proclamation and Order, or part thereof, designates a different penalty for a particular violation."). The argument is based on case law like *Bolden-Hardge v. Office of California State Controller*, 63 F.4th 1215 (9th Cir. 2023), in which the Ninth Circuit reiterated that, with private employers, "'an employer is not liable under Title VII for failure to accommodate when accommodating an employee's religious beliefs would require the employer to violate federal or state law' because 'the existence of such a law establishes "undue hardship."'" *Id.* at

1225 (quoting *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830 (9th Cir. 1999)) (brackets omitted); *see also, e.g.*, *Riley v. N.Y. City Health & Hosps. Corp.*, 2023 WL 2118073, at *4 (S.D.N.Y. Feb. 17, 2023) (reiterating that "Title VII cannot be used to require employers to break the law" in addressing a religious challenge arising from a COVID-19 vaccine mandate) (citations omitted)

Specifically, the HSO points to paragraph A of "Order 10: Safe Access Oahu," of the Mayor's Proclamation, which provided that "all covered entities shall not permit a full or part-time employee . . . to enter covered premises without proof of full vaccination." ECF No. 11-6 at PageID.110. Notably—although the Mayor's Proclamation does not include a specific exemption for religious beliefs—Order 10 listed four other specific "Exceptions" that allow individuals "to enter covered premises without proof of full vaccination." *Id.* The second exception ("Exception Two") included "[f]ull or part-time employees . . . with proof of a negative COVID-19 test result taken within seven (7) days of entry into the covered premises . . . ." *Id.* In short, the Mayor's Proclamation allowed testing in lieu of vaccination.

And so, the court rejects this defense of undue hardship. First, the HSO appears to misread the Complaint in arguing that the HSO could not "waive the COVID Protocols for Plaintiff." *See* ECF No. 11-2 at PageID.59. The Complaint is not alleging a failure of the HSO to waive the Protocols. Rather, it is

based on an alleged failure of the HSO to even consider Gallagher's request for an exemption, *as allowed for* in the Protocols. *See* ECF No. 11-9 at PageID.200 (Protocols purporting to allow for "an approved exemption" from the vaccination requirement "due to a medical reason" or "a sincerely held religious belief"). The Complaint's operative theory is that the HSO unlawfully discriminated based on religion by ignoring the request for an exemption, essentially determining that any exemption would be an undue hardship. *See* ECF No. 1 at PageID.12 (Complaint alleging that "despite this express term [allowing testing], Mr. Gallagher was given no such choice" and that "Mr. Gallagher's request [for exemption] was not processed at all—it was completely ignored," and "despite this express exception, it was not provided to Mr. Gallagher to allow him to continue performing and avoid being placed on indefinite unpaid leave").[13]

And, similar to Exception Two in the Mayor's Proclamation, the CBA's COVID-19 Protocols allowed for testing, if an exemption was granted, so long as the musician could perform with a face mask. Only those musicians who

[13] At times, the Complaint equates—rather imprecisely—a request for an "exemption" as being the same thing as a request for an "accommodation." Although there may be an important difference between "exemption" and "accommodation" given the particular terms of the Protocols, the court—construing the Complaint in the light most favorable to the plaintiff—reads the Complaint to mean Gallagher sought to avoid the vaccination requirement *with* testing in lieu of vaccinating (or at least the HSO should have engaged in an interactive process to consider testing). If Gallagher had sought to avoid vaccination *without* testing, then the HSO's conflict-with-law argument has validity because the HSO would have violated the Mayor's Proclamation with such an exemption.

must remove their face mask to perform (for example, "wind and brass players or . . . singers and speakers when actively performing"), would be precluded from the testing exemption from vaccination. Those individuals would "not be able to utilize two levels of mitigation [face masks and testing]," and were considered to be "a direct threat to the health and safety of the individual and others." ECF No. 11-9 at PageID.200.[14] But this disallowance would not have applied to Gallagher—a bass player (a stringed instrument)—who *could* perform with a

---

[14] To repeat, the CBA's COVID-19 Protocols included the following section on exemptions:

> **Exemptions:**
>
> Individuals who have received an exemption or who have not yet received a response from a timely application must provide a negative PCR COVID-19 test date stamped no longer than 48 hours before each entry at the HSO Office, Hawaii Theatre Center, Blaisdell Concert Hall, or all other venues the HSO is utilizing in an official capacity. See the testing provision below. If an individual with an exemption who can play their instrument while wearing a face mask, refuses to be tested, they will be placed on leave without pay status but will retain their medical and instrument insurance through July 3, 2022. They may be permitted to return to work once these protocols are lifted, or they are in compliance with the protocols on a rolling basis; January 10, 2022, February 22, 2022, or May 16, 2022.
>
> Individuals with an exemption that must remove their face mask in order to perform will not be able to utilize two levels of mitigation. This is considered a direct threat to the health and safety of the individual and others. Therefore, they will be placed on leave without pay status, but will retain their medical and instrument insurance through July 3, 2022. They may be permitted to return to work once these protocols are lifted, or they are in compliance with the protocols on a rolling basis; January 10, 2022, February 22, 2022, or May 16, 2022.

mask. And, again, the Complaint also alleges that Gallagher was not given the opportunity to use these levels of mitigation, i.e., proof of a negative test and masking. *See* ECF No. 1 at PageID.12.

Thus, the CBA's COVID-19 Protocols *allowed* the HSO to grant an exception to vaccination for certain musicians (who can perform while wearing a mask, like Gallagher) that would have been consistent with the Mayor's Proclamation. That is, at least based on the facts alleged in the Complaint, it is a false premise that the HSO had no choice but to deny an exemption from the vaccine requirement that included testing or else be in violation of the Mayor's Proclamation.[15]

*b. Endangering other musicians and the public*

The HSO also claims undue hardship because accommodating Gallagher would have subjected other musicians and the public to an increased risk

---

[15] The Complaint includes certain background allegations that might suggest that Gallagher disagreed with *all* the CBA's Protocols (including testing). For example, it alleges that "[t]he Policy did not offer, discuss, or promote early treatment options, in lieu of the covid shots" and "did not offer, discuss, or promote natural immunity as an effective countermeasure against illness from the covid virus." ECF No. 1 at PageID.8. And it alleges that "the Policy was irrational, arbitrary, and capricious from the start." *Id.* at PageID.9. But the Complaint is not seeking, retrospectively, to challenge the Policy facially. Rather, its actual claims are for religious discrimination and retaliation based on the allegation that Gallagher's request for accommodation (including testing components) was rejected out of hand—evidencing an anti-religious animus.

In that regard, the HSO's counsel's argument made at the hearing that Gallagher in fact told the HSO that he would *not* agree to testing could be a matter for summary judgment, but cannot be addressed at this motion-to-dismiss stage where the Court must assume the Complaint's well-pleaded facts are true and where the Complaint alleges that Gallagher was not given the opportunity to comply with the Protocol's conditions.

of COVID-19 infection and jeopardized health and safety. It argues that the HSO's overall musical performance would have suffered due to a lack of musicians who would have gotten sick or been unable to attend rehearsals. It claims that the "HSO's audience is generally older" and thus patrons are at a higher risk for infections, turning performances into potential "super-spreader events." ECF No. 11-2 at PageID.60–61. Whether or not these assertions were, or were thought to have been, true at the time, the arguments are not based on evidence that can be considered at a motion-to-dismiss stage, nor are all of the assertions apparent from the allegations of the Complaint.

Undue hardship is an affirmative defense and "a context-specific standard." *Groff*, 143 S. Ct. at 2297. In deciding whether an accommodation "would result in substantial increased costs in relation to the conduct of [the HSO's] business," the court must "take into account all relevant factors . . . including the particular accommodations at issue . . . in light of the nature, size and operating cost of [the HSO]." *Id.* at 2295. And so, dismissal of the Complaint at this motion-to-dismiss stage "is proper 'only if the defendant shows some obvious bar to securing relief on the face of the complaint' or in 'any judicially noticeable materials." *Bolden-Hardge*, 63 F.4th at 1224–25 (quoting *ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014)).

Given the standard reiterated in *Bolden-Hardge*—although a danger appears obvious given news reports and reliable sources of medical knowledge—the court is unable to find as a matter of law at this motion-to-dismiss stage that the HSO is entitled to this undue hardship defense. The court has no knowledge, for example, of the HSO's particular operations or performance limitations, nor those of a symphonic orchestra generally. Nor can it assume to know the demographics of the HSO's particular audience, much less the types and feasibility of changes a symphony could make to accommodate musicians. And the court would need to consider whether Gallagher could have performed safely with a mask while having been tested at regular intervals, taking judicial notice that a bass is a string instrument.

That is, it is not clear from the face of the Complaint and judicially-noticeable documents that the HSO is entitled to this undue hardship defense under *Groff* at this stage. "This is a fact-intensive inquiry that cannot properly be decided on the limited record before this Court." *MacDonald v. Or. Health & Science Univ.*, ___ F. Supp. 3d ___, 2023 WL 5529959, at *8 (D. Or. Aug. 28, 2023) (denying motion to dismiss complaint alleging religious discrimination for failure to exempt plaintiff from COVID-19 vaccination requirement, rejecting undue hardship defense based on substantial cost, and alleged inability to grant exemption without violating government regulations); *see also, e.g.*, *Zimmerman*, 2023 WL

7413650, at *10 (reasoning when evaluating undue hardship in a COVID-19 vaccination challenge, that "[t]he amended complaint, including the materials cited within it, is not sufficient to establish undue hardship . . . [but] a standard of review that allows for the consideration of evidence may yield a different outcome"); *Lee v. Seasons Hospice*, ___ F. Supp. 3d ___, 2023 WL 6387794, at *4 (D. Minn. Sept. 29, 2023) ("It may be true that accommodating plaintiffs by offering religious or medical exemptions would have increased the risk to staff and patients or damaged Seasons' reputation—and it may be true that the increased risks or reputational damage would have been significant enough to create an undue hardship—but these are matters that cannot be resolved without a factual record.").

Accordingly, the HSO's Motion to Dismiss as to an undue hardship defense based on public and employee safety is DENIED.

**D. The Complaint States a Plausible Claim for Retaliation in Part**

A prima facie retaliation claim under Title VII requires that (1) the plaintiff "have engaged in a protected activity," (2) the plaintiff "suffered an adverse employment action," and (3) "there was a causal link" between the protected activity and the adverse action. *Stegall v. Citadel Broad. Co.*, 350 F.3d

1061, 1065–66 (9th Cir. 2003) (citation omitted).[16] A Title VII retaliation claim is based on 42 U.S.C. § 2000e-3(a), which provides:

> Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings
>
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has *opposed* any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or *participated* in any manner in an investigation, proceeding, or hearing under this subchapter.

(Emphases added).[17]

The first clause ("opposed any practice made unlawful") is known as the "opposition clause," and the second clause ("made a charge, testified, assisted,

---

[16] Although a prima facie case is "an evidentiary standard, not a pleading requirement," *Swierkiewicz*, 534 U.S. at 510, the court may still consider those elements in determining whether a complaint pleads sufficient factual allegations to state a plausible claim of retaliation. *See, e.g.*, *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016) ("[Plaintiff's] retaliation claim may survive [defendant's] motion to dismiss if she pleads sufficient factual allegations to raise a reasonable expectation that discovery will reveal evidence of the following elements: (1) she engaged in conduct protected by Title VII; (2) the employer took adverse action against her; and (3) a causal link exists between her protected conduct and the employer's adverse action."); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d. Cir. 2015) ("[F]or a retaliation claim to survive a motion for judgment on the pleadings or a motion to dismiss, the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against him, (2) "because" he has opposed any unlawful employment practice.").

[17] Likewise, a retaliation claim under HRS § 378–2 is subject to the same three-part test. *See, e.g.*, *Gonsalves v. Nissan Motor Corp. in Haw.*, 100 Haw. 149, 162, 58 P.3d 1196, 1210 (2002).

or participated") is known as the "participation clause." *See, e.g.*, *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 274 (2009).

*a. Protected Activity*

Plaintiff's "protected activity" is apparently based on both (1) the opposition clause of § 2000e-3(a), *see* ECF No. 1 at PageID.21 (Complaint alleging that Plaintiff "engaged in the protected activity of requesting an accommodation from the Policy based on his sincerely held religious beliefs" and that "[t]here is a causal link between the two—submitting his protected request for accommodation and HSO's adverse employment action . . . ."), and on (2) the "participation clause" of § 2003e(3)(a), *see id.* (alleging that Gallagher "engaged in the protected activity of filing a Charge of discrimination with the EEOC and HCRC after his request [for exemption] was denied").[18]

As for the opposition clause, the Complaint's allegation that Gallagher "engaged in the protected activity of requesting an accommodation from the Policy based on his sincerely held religious beliefs," *id.*, is ambiguous. If it is based solely on Gallagher requesting a religious-based exemption as provided in the CBA's COVID-19 Protocols, then it is unclear how such a request would be

[18] A retaliation claim based on the "participation clause" would seem to fail for lack of a causal link because the adverse employment action (indefinite unpaid leave) occurred *before* Gallagher engaged in that protected activity—the EEOC charge was not filed until "after his request was denied," ECF No. 1 at PageID.21, and he was placed on unpaid leave.

"opposing" an unlawful practice—the Protocols contained the very request he was seeking. But if Gallagher is basing a retaliation claim on seeking an exemption greater than from the Protocols themselves as written—such as a religious-based exemption from the testing component of the Protocols—then that kind of request might constitute "opposition" to the policy.

The HSO's Motion, however, did not specifically challenge the proposition that simply requesting an exemption from the vaccination requirement can constitute "opposition" for purposes of the "protected activity" element. As the court mentioned at the hearing, the Eighth Circuit has held that a request for an accommodation by itself is insufficient to constitute "opposing" an unlawful employment practice for purposes of a Title VII retaliation claim. *See E.E.O.C. v. N. Mem'l Health Care*, 908 F.3d 1098, 1102–03 (8th Cir. 2018) ("Consistent with the plain meaning of the word 'oppose,' the initial request for a religious accommodation simply does not 'implicitly' constitute opposition to the ultimate denial of the requested accommodation."). Some courts, however, have decided otherwise, indicating that the question is contextual—in cases both under the Americans with Disability Act and for certain Title VII retaliation claims. *See, e.g.*, *Enriquez v. Gemini Motor Transport LP*, 2021 WL 5908208, at *7 (D. Ariz. Dec. 14, 2021) (citing cases); *Parker v. Children's Nat'l Med. Ctr., Inc.*, 2021 WL

5840949, at *22–23 (D. Md. Dec. 9, 2012) (same). The issue is sufficiently nuanced such that the court will not address it here on a sua sponte basis.

And so, for present purposes, the court will assume—given that the issue was neither raised nor briefed—that Gallagher's request for an exemption in the context he alleges it was made (and construing the Complaint's allegations in Plaintiff's favor) can satisfy the "protected activity" aspect of his retaliation claims. *See, e.g.*, ECF No. 1 at PageID.13 (Complaint alleging "[w]hen [Gallagher] followed up with HSO for a status [the HSO] responded by arbitrarily calling him [a] 'threat to others' and placed him on indefinite unpaid leave.").

*b. Causation—Whether the protected activity was a "but for" cause of adverse action*[19]

The HSO next seeks to dismiss the retaliation claims because the CBA's COVID-19 Protocols were "a religion-neutral policy that had been established *before* Plaintiff made a religious accommodation claim." ECF No. 11-2 at PageID.63 (emphasis in original). It points out that the CBA's COVID-19 Protocols were implemented on October 22, 2021, which was before Gallagher's October 29, 2021 request for a religious accommodation. *Id.* It thus argues that "Plaintiff cannot establish a prima facie retaliation case because he has not alleged

[19] The court has already addressed the HSO's challenge to the second element (adverse employment action).

that he was made to comply with the COVID Protocols because of his religion." *Id.* at PageID.61.

The HSO relies on reasoning set forth in *O'Hailpin v. Hawaiian Airlines*, 583 F. Supp. 3d 1294 (D. Haw. 2022), and other cases that have rejected retaliation claims in a vaccination context based on a lack of causation. *O'Hailpin*—decided with evidence at an injunctive-motion stage—reasoned in part that plaintiffs were unlikely to succeed on retaliation claims because any adverse employment action "appear[ed] to be unconnected to their [accommodation requests]." *Id.* at 1311. *O'Hailpin* explained:

> Indeed, the vaccine policy was established, as well as the consequences for failing to comply with the policy — i.e., the adverse employment actions at issue here — before Plaintiffs submitted their [accommodation] requests. . . . In other words, employees were subject to termination or unpaid leave for violating the policy irrespective of whether they submitted an [accommodation] request.

*Id.* Another case in this district relied on similar rationale in rejecting an ADA retaliation claim also based on a refusal to vaccinate against COVID-19. *See Cunningham v. Univ. of Hawaii*, 2023 WL 1991783 (D. Haw. Feb. 14, 2023). As *Cunningham* reasoned:

> Defendant enacted its COVID-19 policy, along with the punishments for noncompliance, before Plaintiff notified Defendant of his alleged ADA-based opposition to the policy. The only reasonable inference is that Plaintiff would have faced these punishments for his failure to

> comply with the policy even if he had never said anything about the ADA. Defendant's disciplinary steps "were not actions that Defendant undertook deliberately to aim at Plaintiff on the basis of [his] criticism of the policy."

*Id.* at *5 (D. Haw. Feb. 14, 2023) (quoting *Linne v. Alameda Health Sys.*, 2023 WL 375687, at *3 (N.D. Cal. Jan. 24, 2023)), *aff'd*, 2023 WL 10351531 (9th Cir. Sept. 14, 2023) (mem.). And courts across the country have applied that rationale in the same context. *See, e.g.*, *Librandi v. Alexion Pharmaceuticals, Inc.*, 2023 WL 3993741, at *8 (D. Conn. June 14, 2023) (citing cases); *Hines v. Ellis Nursing Home, Inc.*, 2023 WL 7619035, at *5 (D. Mass. Nov. 14, 2023) (same); *Shklyar v. Carboline Co.*, 616 F. Supp. 3d 920, 927 (E.D. Mo. 2022) (same).

This court agrees with those cases, and so retaliation based on a theory that Gallagher was placed on indefinite unpaid leave as retaliation solely for requesting an exemption as set forth in the Protocols fails for lack of causation—under that theory, he was placed on indefinite unpaid leave for failure to comply with the Protocols, not because of any protected activity.

But Gallagher is not facially challenging the Protocols themselves, nor does he claim retaliation on a theory that he was "made to comply with the COVID Protocols because of his religion," as the HSO contends. Rather, he is also alleging retaliation based on a theory that he was placed on indefinite unpaid leave without the HSO even considering his request. Specifically, he alleges that he

"was placed on indefinite unpaid leave without any interactive process after submitting his request for accommodation, and after he followed up on that request." ECF No. 1 at PageID.21. That is, in part, the HSO allegedly ignored his exemption request, and retaliated against him for "following up" on it. To that extent, there are adequate allegations that discriminatory animus was a "but for" cause of adverse employment action.[20]

In sum, the HSO's Motion is GRANTED in part and DENIED in part. It is granted as to allegations that Gallagher was retaliated against solely for refusing to vaccinate (and leave to amend in this regard would be futile, given a lack of causation). But a retaliation claim is otherwise plausible based on the allegations in the Complaint.

### E. Count V for Punitive Damages Is Dismissed as a Stand-Alone Count, Although Such Damages Remain as a Possible Remedy as Alleged in the Complaint

Finally, the Motion to Dismiss argues—and Plaintiff apparently does not dispute—that a separate count for "Punitive Damages" can be dismissed because (although punitive damages are a possible remedy) there is no independent

[20] The HSO appears to argue in part that it was justified in having told Gallagher he was a "direct threat"—as the Complaint alleges. *See* ECF No. 11-2 at PageID.62 (HSO arguing that "Plaintiff's allegation of being told he was a 'direct threat' . . . comes from page 2 of the COVID Protocols [which consider individuals who cannot perform with a mask to be a 'direct threat to the health and safety of the individual and others']). But, as analyzed earlier, Gallagher is a bass player who could perform with a mask, who thus would not fit within the "direct threat" provision in the Protocols if tested.

cause of action for punitive damages under Hawaii law. *See, e.g.*, *Ross v. Stouffer Hotel Co.*, 76 Haw. 454, 466, 879 P.2d 1037, 1049 (1994) ("[A] claim for punitive damages is not an independent tort, but is purely incidental to a separate cause of action."); *Smallwood v. NCsoft Corp.*, 730 F. Supp. 2d 1213, 1236 (D. Haw. 2010) (same). The Motion to Dismiss is well-taken as to Count V.

To be clear, the HSO has not argued that the facts as alleged do not justify an award of punitive damages—the court has not addressed such allegations. Nor has it argued that punitive damages are not an available remedy against a private employer under Title VII. *See, e.g.*, *Kolstad v. Am. Dental Assn.*, 527 U.S. 526, 534 (1999) (discussing availability of punitive damages against private parties under Title VII in 42 U.S.C. § 1981a(b)(1)). In short, punitive damages remain as a possible remedy even if there is no independent cause of action as alleged in Count V of Gallagher's Complaint. To that extent, HSO's Motion to Dismiss is GRANTED as to Count V. Count V is DISMISSED as a separate cause of action, although the factual allegations supporting an award of punitive damages remain.

## V. CONCLUSION

For the foregoing reasons, the Motion to Dismiss, ECF No. 11, is GRANTED in part and DENIED in part. It is GRANTED in part as to certain

retaliation allegations. And it is GRANTED as to Count V alleging punitive damages alone. It is DENIED in all other respects.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 27, 2024.




/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*Gallagher v. Hawaii Symphony Orchestra*, Civ. No. 23-00395 JMS-RT, Order Granting in Part and Denying in Part Defendant's Motion to Dismiss Complaint, ECF No. 11